# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 14, 2013 Session

## JOHN H. PATTY v. RAY LANE, ET. AL.

**Appeal from the Chancery Court for Knox County**
**No. 1777712   Hon. Daryl R. Fansler, Chancellor**

_____

**No. E2012-01787-COA-R3-CV - Filed July 3, 2013**

_____

This appeal involves the breach of an oral contract. Defendants approached Plaintiff about utilizing fill dirt on Plaintiff's property. Plaintiff agreed. Defendants subsequently executed a plan to control the sediment as they excavated the property. Over the course of the next three years, the City of Knoxville sent Plaintiff two notices of violation, one of which carried a fine, for improper sediment control, illegal dumping and discharge, and failure to obtain a city permit. Defendants paid the fine, applied for a city permit as required, and attempted to stabilize the property. Two years later, Plaintiff received two more notices of violation, one of which carried a fine. Plaintiff paid the fine and hired an engineer to properly stabilize the property after Defendants refused to respond to his request for assistance. Plaintiff then filed suit for breach of contract, seeking reimbursement for his payment of the second fine and for the cost of professionally stabilizing the property. Defendants denied liability and asserted that a contract had never been formed. The trial court found that a contract existed, that Defendants breached the contract, and that Plaintiff was entitled to damages in the amount of $29,249.02. Defendants appeal. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ. joined.

Darren V. Berg and Brett D. Stokes, Knoxville, Tennessee, for the appellants, Ray Lane and Rob Gregory.

Daniel V. Parish, Knoxville, Tennessee, for the appellee, John H. Patty.

# OPINION

## I. BACKGROUND

John H. Patty ("Plaintiff") owned approximately 2.3 acres of undeveloped property in Knoxville, Tennessee on Callahan Road. In 2003, Ray Lane and Rob Gregory (collectively "Defendants") sought permission from Plaintiff to use the property as a "borrow pit" for several construction projects they each had in the area. Plaintiff agreed. In 2004, Defendants learned that Tennessee required them to obtain a state permit and institute a plan for erosion control if they desired to continue excavating the property. Defendants hired an engineering company to prepare a Stormwater Pollution Prevention Plan ("the Plan") and obtain a state permit. The Plan outlined their responsibilities for erosion and sediment control as they removed dirt from the property. In May 2006, the City of Knoxville issued a notice of violation for inadequate erosion or sediment controls and for grading or filling without a city permit. In May 2007, the City of Knoxville issued a second notice of violation for inadequate erosion or sediment controls, for grading or filling without a city permit, and for illegal dumping or discharge. The 2007 notice carried a fine of $5,000. Mr. Lane paid the fine and procured a city permit. It was at that point that Mr. Lane informed Plaintiff that he no longer intended to use the property. Likewise, Mr. Gregory had ceased his use of the property sometime prior to Mr. Lane's declaration of non-use.

Years passed without communication or further development of the property until 2009, when Plaintiff's son, John P. Patty ("Son"), learned that the property had not been stabilized to the City of Knoxville's satisfaction. Son informed Mr. Lane of that fact, and Mr. Lane returned to the property in an attempt to remedy the problem. Mr. Lane's efforts were unsuccessful. The City of Knoxville issued two subsequent violations, one in March 2009 and the other in July 2009. The second violation carried a fine of $5,000. After losing his appeal of the second violation, Plaintiff paid the fine. Plaintiff also hired an engineer, J.B. Turnmire, to professionally stabilize the property and subsequently paid Mr. Turnmire $24,249.02 when the work was completed.

Thereafter, Plaintiff filed suit against Defendants for breach of contract based upon their failure to properly stabilize the property. Plaintiff sought reimbursement for the July 2009 fine and for the work performed by Mr. Turnmire. Defendants denied wrongdoing, contended that a contract never existed, and filed a counter-complaint for damages for having to defend against a frivolous complaint.

A trial was held at which Plaintiff, Son, and Mr. Lane testified. In lieu of trial testimony, Mr. Gregory's deposition was entered into the record for review by the trial court. Plaintiff testified that he owned nine lots of property on Callahan Road. He stated that in

2003, Defendants requested permission to use dirt from the undeveloped property at issue in this case. He gave permission in the hope that the property would appreciate or become easier to develop as dirt was removed.[1] He conceded that Defendants never removed enough dirt to assist in future development efforts and that he did not know whether the property appreciated as a result of the excavation. In addition to giving permission to remove the dirt, he asked Mr. Lane how the sediment would be controlled as dirt was removed. He claimed that Mr. Lane hired an engineering company to issue a proposal on the way in which to control the sediment. He recalled that he later received a copy of the Plan from Defendants.

Plaintiff testified that prior to the excavation of the property, he had never received a notice of violation from the City of Knoxville regarding the property at issue. He stated that he received his first notice of violation in May 2006 and the second in May 2007. He claimed that the 2007 violation carried a fine, which Mr. Lane paid. He received a third violation in March 2009 and a fourth in July 2009. He claimed that the fourth violation carried a fine, which he paid after he lost an appeal against the fine. He insisted that Defendants and their associates were the only people with permission to excavate the property prior to his hiring of Mr. Turnmire.

Plaintiff testified that at some point, Son helped him with issues pertaining to the property because his health had deteriorated. He claimed that Defendants never remedied the situation in 2009 and that he was ultimately forced to hire Mr. Turnmire to work with the City of Knoxville in professionally stabilizing the property. He could not remember the exact date that he hired Mr. Turnmire, but he produced invoices documenting the total cost of $24,249.02 to stabilize the property. He related that he had not received any additional violations from the City of Knoxville since Mr. Turnmire stabilized the property.

Son testified that he first assisted Plaintiff in 2007. He related that he rode with Mr. Lane to pay the $5,000 fine for the 2007 violation. He claimed that at some point, Mr. Lane also paid $600 for a city permit. He acknowledged that Defendants never removed any additional dirt after Mr. Lane paid the fine.

Son testified that he spoke with Mr. Lane in 2009 regarding the property's lack of stabilization and claimed that Mr. Lane went to the property in an attempt to help with stabilization efforts. He applied for a permit on Mr. Lane's behalf, but Mr. Lane eventually became uncooperative and unresponsive to additional requests for assistance after he informed Mr. Lane that the work was inadequate. He related that Plaintiff finally hired Mr. Turnmire to properly stabilize the property after receiving the fourth violation. He sent

---

[1]He conceded that he did not know how much the property was worth prior to or after the removal of dirt.

Defendants copies of the receipts for the stabilization and also informed them of the outcome of the appeal.

Mr. Lane did not know whether he asked Plaintiff about removing dirt from the property or whether Plaintiff asked him to remove dirt. He claimed that "another outfit" was also removing dirt from the property and that he observed others dumping concrete or asphalt on the property. He acknowledged that at some point, he, Mr. Gregory, and Plaintiff came to an agreement regarding the removal of dirt. He related that from time to time, he temporarily stabilized the property with seed, straw, and rock but conceded that he had never stabilized commercial property prior to his involvement with the property at issue. He admitted that he did not comply with all of the terms contained in the Plan. He admitted that pursuant to the Plan, it was his responsibility to ensure that the property was stabilized. He claimed that in 2007, he paid $5,350 for the city violation and $600 for a city permit. He agreed that he was responsible for sediment and erosion control at that time.

Mr. Lane testified that he did not remove additional dirt after paying the 2007 fine. Although he told Plaintiff that he did not need additional dirt, he never gave Plaintiff or the City of Knoxville written notice of that fact in 2007. He also never contacted an engineer to ensure that the property was properly stabilized. He claimed that Plaintiff asked him to continue removing dirt or find others who would remove dirt. At Plaintiff's request, he returned to the property to perform some additional stabilization work sometime in 2009. He finally filed a notice of termination of permit coverage in October 2009.

In his deposition, Mr. Gregory testified that he and his wife created R.C.G., Incorporated[2] in 2003 or 2004. He stated that he had acquired two or three different grading projects for his company when he sought permission to remove dirt from the property. He related that he generally spoke to Mr. Lane about the property and that his involvement with Plaintiff was limited. He said that agreements like the one at issue usually consisted of a simple handshake but asserted that as requirements for excavation and grading changed, he was required to obtain permits and other documentation.

Mr. Gregory testified that he and Mr. Lane obtained the Plan and an accompanying permit because it was required to continue excavating the property. He stated that he and Mr. Lane removed dirt for completely different projects but that they always kept the property "in good enough shape." He said that he was finished with the property in 2006 but that Mr. Lane continued to excavate and comply with the erosion control measures. He admitted that he may have returned to the property at some point to visit Mr. Lane but insisted that he discontinued his excavation of the property in 2006. He claimed that he passed the property

---

[2]R.C.G., Incorporated had been dissolved at the time of the trial.

approximately once a week and opined that the property appeared stable to him. He could not remember if he submitted any money to Mr. Lane to pay the fine or apply for the requisite city permit in 2007. He was in Kentucky at the time of the 2009 violation and admittedly never responded to Son's request for assistance. He did not file a notice to terminate his permit until October 2009. He explained that it simply "slipped [his] mind" because he had not removed dirt from the property in three years. He finally filed the notice of termination when he learned that Plaintiff had allowed other contractors to use his permit.

Following the presentation of the above evidence, the trial court dismissed the counter-complaint filed by Defendants and stated,

> Defendants entered into an oral contract with [] Plaintiff to use his property as a "borrow pit". Defendants would remove dirt from Plaintiff's property and haul it to another location to be used as fill. Plaintiff benefitted by having his property leveled for possible future development[,] and Defendants got dirt they needed elsewhere.

The court further found that Defendants admitted liability for the soil and erosion problems by paying the first fine and that their failure to remedy the problem resulted in subsequent violations. Despite acknowledging that Defendants breached the contract, the court held that Plaintiff failed to prove any amount of damages beyond that of the $5,000 fine for the 2009 violation. The court noted that Plaintiff had failed to offer any proof as to the reasonable market value of the property prior to or after the injury to the property and had failed to offer testimony as to the reasonableness and necessity of the work performed by Mr. Turnmire.

Plaintiff filed a motion to alter or amend, alleging that the court erred in determining the measure of damages. He contended that the proper measure of damages was the lesser of the cost of correction of the injury to the property or the diminution in market value of the property. He argued that Defendants bore the burden of establishing that the cost of repairs was unreasonable as compared to the diminution in the market value of the property. He noted that he offered sufficient proof of the cost of repairs and that Defendants did not object to the cost or offer any proof as to the diminution in the market value of the property.

Defendants responded by asserting that Plaintiff never offered any evidence regarding the market value of the property. Defendants also asserted that Plaintiff failed to prove that they caused the alleged loss to the property or that the loss was directly related to the alleged breach of the contract. They noted that a substantial period of time elapsed between the first fine and the subsequent fine and that Son accepted complete and sole responsibility for the property by obtaining a new city permit in 2009. They asserted that the judgment should be amended to reflect that Plaintiff did not suffer any damages.

In consideration of Plaintiff's motion, the court amended its judgment to reflect an award of $29,249.02 to Plaintiff. The court held that the statements contained in the invoices, which were admitted into evidence without objection, established that the work performed by Mr. Turnmire was reasonable and necessary. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal as follows:

A. Whether a contract existed that required Defendants to control the erosion and sediment on the property.

B. Whether Defendants breached the contract, causing damage to Plaintiff.

C. Whether the trial court erred in amending its judgment to award Plaintiff damages in the amount of $29,249.02.

## III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

This court reviews a trial court's decision to grant or deny a motion to alter or amend a judgment under an abuse of discretion standard. *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003). "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

# IV. DISCUSSION

In Tennessee, a breach of contract claim includes the following elements:

(1) the existence of an enforceable contract;

(2) nonperformance amounting to a breach of the contract, and

(3) damages caused by the breach.

*ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (citations omitted).

## A.

Defendants assert that Plaintiff cannot recover on his breach of contract claim because a contract with sufficient consideration never existed. They contend that Plaintiff's mere hope that the property would appreciate was insufficient to establish consideration for their use of the property; therefore, Plaintiff never mutually assented to any terms that could serve to form a contract. They claim that their obligation to ensure erosion and sediment control was simply a necessity after they started excavating. Plaintiff responds that the initial contract was formed in 2003 when he gave Defendants permission to excavate. He asserts that the contract was modified in 2004 when Defendants encountered unforeseen difficulties and subsequently accepted an additional obligation to control the property's erosion and sediment in order to continue excavating the property.

A contract, either written or oral, "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Higgins v. Oil, Chem. and Atomic Workers Int'l Union*, 811 S.W.2d 875, 879 (Tenn. 1991) (internal quotation and citation omitted). Tennessee courts have also defined a contract more simply as "'an agreement, upon sufficient consideration, to do or not to do a particular thing.'" *Calabro v. Calabro*, 15 S.W.3d 873, 876 (Tenn. Ct. App. 1999) (quoting *Smith v. Pickwick Elec. Coop.*, 367 S.W.2d 775, 780 (Tenn. 1963) (internal citation omitted)). "'For there to be consideration in a contract between parties to the contract it is not necessary that something concrete and tangible move from one to the other. Any benefit to one and detriment to the other may be a sufficient consideration.'" *GuestHouse Intern., LLC v. Shoney's North America Corp.*, 330 S.W.3d 166, 189 (Tenn. Ct. App. 2010) (quoting *Walker v. First State Bank*, 849 S.W.2d 337, 342 (Tenn. Ct. App. 1992)). Indeed, "'[a]ny

consideration, however small, will support a promise." *Id.* (quoting *Smith v. Riley*, No. E2001-00828-COA-R3-CV, 2002 WL 122917, at \*3 (Tenn. Ct. App. Jan. 30, 2002)).

Generally, once a contract is formed it cannot be modified without consent and additional consideration for the new terms. *Id.* at 190. An exception to the general rule requiring consideration for the modification of a contract "arises in the common situation in which a party to a contract encounters unforeseen difficulties in performing its obligations under the contract." *Id.* at 190-91. In such cases, "a modification of an existing contract need not be supported by new consideration so long as it is agreed upon by the parties in light of unforeseen difficulties, and the modification is fair and equitable under the circumstances." *Id.* at 191 (citation and footnote omitted).

In this case, Defendants desired to excavate the property for use in their various construction projects. The evidence reflects that Plaintiff had a corresponding desire to remove dirt from his property in the hope that the removal of dirt would likely result in the appreciation of the property or in the increased ability to further develop the property. Defendants admitted that Plaintiff even asked them to find others to excavate the property when they declared they had ceased their excavation efforts. In consideration of these facts, we conclude that the "handshake agreement" to remove dirt from the property was supported by reciprocal consideration, namely that Defendants recovered dirt they needed elsewhere and that Plaintiff disposed of dirt he no longer needed. While Defendants never removed enough dirt to affect the ease of the future development of property, Plaintiff still retained a small benefit from the agreement because dirt that he no longer needed was removed from his property. The parties also mutually assented to the terms, namely that Defendants would remove dirt from the property and that Plaintiff allowed Defendants access to his property in order to remove dirt. Accordingly, we further conclude that a valid oral contract had been formed between Defendants and Plaintiff at that time.

Once the initial contract was formed, Defendants learned that they were required to obtain a permit and a Stormwater Pollution Prevention Plan to continue the excavation of the property. Likewise, Plaintiff discovered that a plan needed to be put in place in order to control the erosion and sediment on the property. When Plaintiff asked Defendants about their intentions regarding erosion and sediment, Defendants responded that they would take responsibility and had already obtained the Plan, which provided guidance on the erosion and sediment issues. We hold that the procurement of the Plan and agreement to control the erosion and sediment on the property was a subsequent modification of the contract that was agreed upon in light of unforeseen difficulties and was fair and equitable under the circumstances. Accordingly, we conclude that the initial contract was properly modified in that Defendants were responsible for controlling the erosion and sediment on the property and for eventually stabilizing the property.

B.

Defendants assert that Plaintiff failed to prove that any action or inaction by either of them caused the fine to be levied or the need for remediation three years after they ceased their excavation efforts. They assert that the alleged damages did not occur when they were removing dirt from the property and that "any number of individuals . . . could have caused the fine to be levied and the need for the remediation plan and attendant costs." They contend that Mr. Lane's payment of the 2007 fine should not have been viewed as an admittance of liability and note that Son filed an application for a permit shortly before the City of Knoxville levied the 2009 fine. Plaintiff responds that he effectively established that Defendants breached the contract, causing damages.

The evidence reflects that Defendants specifically agreed to control the erosion and sediment issue caused by their excavation and to properly stabilize the property once they left. Mr. Lane even paid the 2007 fine in recognition that he was responsible for stabilization. Citing *Williams v. Brown*, 860 S.W.2d 854 (Tenn. 1993), Defendants ask this court to ignore Mr. Lane's payment of the 2007 fine as admittance of liability. In *Williams,* the Court held that defendant's payment of a traffic fine for improper passing was inadmissible as evidence of guilt in a wrongful death action based upon the same occurrence. 860 S.W.2d at 855-57. The decision in *Williams* is simply inapposite to the facts of this case when Mr. Lane freely admitted at trial that he paid the fine on Plaintiff's behalf because he was responsible for the erosion and sediment controls on the property at that time.

Defendants attempt to shift blame by asserting that others could have caused the issue after their departure in 2007. Plaintiff maintained at trial that Defendants were the only parties given permission to excavate the property prior to his hiring of Mr. Turnmire. Defendants confirmed at trial that they were asked to find others to remove dirt in their stead but never asserted that they identified any excavators to take their place. Indeed, Mr. Lane further attempted to stabilize the property when he returned in 2009. As evidenced by the numerous violations and fines levied against Plaintiff for the improper stabilization of the property, the property was not properly stabilized by Defendants in 2007 or in 2009. Son's application for a permit two days before the second fine was levied did not remove the responsibility held by Defendants pursuant to the oral contract when Son was simply attempting to mitigate the damages caused by the breach of the oral contract. Accordingly, we hold that Defendants caused Plaintiff's damages because their failure to stabilize the property as required in the oral contract resulted in the levying of the fine and the need for proper stabilization before further fines could be levied.

C.

While not explicitly stated as such, Defendants also take issue with the trial court's award of damages in the amended judgment. Plaintiff responds that the amended award was appropriate because the cost of repairs were reasonable.

A party may file a motion to alter or amend a judgment within 30 days after the entry of the judgment. Tenn. R. Civ. P. 59.04. "The purpose of a Rule 59.04 motion to alter or amend a judgment is to provide the trial court with an opportunity to correct errors before the judgment becomes final." *In re M.L.D.*, 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005). These motions should "be granted when the controlling law changes before the judgment becomes final; when previously unavailable evidence becomes available; or to correct a clear error of law or to prevent injustice." *Id.* These motions "should not be used to present new, previously untried or unasserted theories or legal arguments." *Id.*

"The purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have had if the contract had been performed." *Wilhite v. Brownsville Concrete Co.*, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990). "While the amount of damages to be awarded in a given case is not controlled by fixed rules of law or mathematical formulas, [] the evidence upon which a party relies to prove damages must be sufficiently certain to enable the trier of fact, using its discretion, to make a fair and reasonable assessment of damages[.]" *BankcorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006) (citing *Overstreet v. Shoney's*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999); *Wilson v. Farmers Chemical Ass'n*, 444 S.W.2d 185, 189 (Tenn. Ct. App. 1969)). This court has held that "'[d]eterminations concerning the amount of damages are factually driven. Thus, the amount of damages to be awarded in a particular case is essentially a fact question. However, the choice of the proper measure of damages is a question of law to be decided by the court.'" *Hatchel*, 223 S.W.3d at 228 (quoting *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998)).

Here, the trial court applied the measure of damages appropriate for injury to real estate, requiring an award of damages for the lesser of the cost of repair or diminution in market value. We believe that this case was more analogous to a breach of construction contract case. Thus, the appropriate measure of damages would be the reasonable cost of repair *unless* evidence was presented to establish that the cost of repair was disproportionate when compared with the diminution in value. *See generally GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541-44 (Tenn. Ct. App. 2005) (discussing the appropriate measure of damages in a breach of a residential construction contract action). Additionally, the purpose in all breach of contract actions is to place Plaintiff in the same position he would have been in had the contract been performed. *Wilhite*, 798 S.W.2d at 775.

Had Defendants properly stabilized the property in 2007, the City of Knoxville would not have levied the second fine against Plaintiff. Plaintiff also would not have hired Mr. Turnmire to stabilize the property in an effort to avoid future fines. No evidence was presented as to a less expensive way in which to stabilize the property in compliance with state and local regulations or as to the diminution in market value of the property. Like the trial court noted, Defendants did not object to the invoices presented by Plaintiff in support of his claim for damages. Accordingly, we conclude that the trial court did not abuse its discretion in amending its judgement to award $29,249.02 in damages, representing the fine and the cost to properly stabilize the property. *See generally In re Estate of Jones*, 183 S.W.3d 372, 378 n. 4 (Tenn. Ct. App. 2005) (acknowledging that this court may affirm a judgment on different grounds than those relied upon by the trial court when the trial court reached the correct result).

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed equally to the appellants, Ray Lane and Rob Gregory.

_____
JOHN W. McCLARTY, JUDGE